UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAMES HAVSGAARD,

Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

Defendant.

No. 1:18-cv-00944-GSA

**ORDER REVERSING DENIAL OF DISABILITY INSURANCE BENEFITS AND REMANDING CASE FOR FURTHER PROCEEDINGS**

I.    **Introduction**

Plaintiff James Havsgaard ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 16, 26 and 28.  Having reviewed the record as a whole, the Court finds that the hearing decision failed to analyze fully the extensive evidence concerning  Plaintiff's mental health and physical impairments and to evaluate the evidence in conformity with applicable law.  Accordingly, the Court remands the case for further proceedings in accordance with this decision.

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

1

## II.    Procedural Background

On March 20, 2014, Plaintiff filed an application for disability insurance benefits alleging disability beginning January 31, 2014.  AR 28.  The Commissioner denied the application initially on July 25, 2014 and following reconsideration on January 7, 2015.  AR 28.

On March 6, 2015, Plaintiff filed a request for a hearing.  AR 28.  Administrative Law Judge Robert Freedman presided over an administrative hearing on May 3, 2017.  AR 94-137.  Plaintiff appeared and was represented by an attorney.  AR 94.  On July 18, 2017, the ALJ denied Plaintiff's application.  AR 28-38.

The Appeals Council denied review on May 17, 2018.  AR 1-7.  On July 12, 2018, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.    Factual Background

Plaintiff (born January 1957) is a high school graduate.  AR 98.  Plaintiff served in the military from April 1974 through April 1976.  AR 46.  His most recent past relevant work was as a manager of a sheet metal company.  AR 98.  He stopped working in 2014 following hernia repair surgery that resulted in chronic pain.  AR 98.

### A.    Medical Records

While he was employed, Plaintiff received his medical care from Kaiser Permanente.  In February 2013, Robert Leon Rudek, M.D., diagnosed a small left inguinal hernia.  AR 347.  In the course of the examination Plaintiff complained of widespread pain in his back, joints, arms and legs.  AR 348.  Dr. Rudek explained the hernia repair procedure to Plaintiff, noting that following outpatient surgery most patients experienced soreness for several weeks but were able to return to work after two weeks.  AR 348.  The doctor warned that, in rare instances, patients experienced a recurrence of the hernia or chronic postoperative pain.  AR 348.

Surgeon Oscar Garcia, M.D., performed Plaintiff's hernia repair surgery in March 2013.  AR 359.  In June 2013, Plaintiff reported post-surgical numbness and some testicular pain.  AR 373-74.  Dr. Garcia observed bilateral varicocele[2] and referred Plaintiff to a urologist for

---

[2] A varicocele is an abnormal dilation and enlargement of one or more scrotal veins.  In rare cases a varicocele may cause orchialgia, which is generally described as dull, aching or throbbing pain, and less frequently as acute, sharp or stabbing pain of the scrotum and testicles.  S. Leslie, H. Sajjad and L. Diref, "Varicocele" (Oct. 2019) (reproduced at

evaluation of the pain. AR 374. Urologist Gaurang Subodh Shah, M.D., observed scrotal swelling and diagnosed left varicocele. AR 382. Sonograms confirmed the diagnosis. AR 386-88. Dr. Shah recommended no intervention. AR 397.

In July 2013, Plaintiff experienced an inguinal strain after lifting a tub in his yard. AR 404. In the course of the ensuing appointment Geana Bumatay Santos, M.D., diagnosed high blood pressure and prescribed medication. AR 405. In August 2013, Plaintiff was again treated for groin pain. AR 422. Internist Khaing Myint, M.D., ordered a hip x-ray which revealed mild left hip joint space narrowing and no break or significant soft tissue abnormality. AR 424, 427.

In October 2013, Plaintiff continued to experience left groin pain and tenderness to palpation. AR 434-35, 444. Dr. Garcia prescribed ibuprofen and methocarbamol, and considered possible nerve impingement. AR 444. When Plaintiff saw Billy H. Chang, M.D., for a blood pressure test at the end of the month, Plaintiff was frustrated and angry complaining that severe pain returned as soon as the pain medications wore off. AR 462. Plaintiff attributed his pain to Dr. Garcia's cutting nerves during the hernia repair. AR 462.

In November 2013, Dr. Rudek explained to Plaintiff that to prevent painful healing certain nerves are routinely cut during repair of an inguinal hernia. AR 471. The doctor explained how a patient could experience nerve pain after a hernia repair and encouraged Plaintiff to try using Nortriptyline, as suggested by Dr. Chang. AR 471. Since Plaintiff experienced some pain relief after warm showers, Dr. Rudek also suggested that Plaintiff try ice packs. AR 471. As a last resort he could elect to repeat the operation as Dr. Garcia had suggested. AR 471.

In January 2014, Vimar B. Patel, M.D., prescribed Norco because Nortriptyline had not relieved Plaintiff's pain. AR 490. Dr. Patel also prescribed capsaicin (Zostrix) since even Plaintiff's skin was painful to the touch. AR 491. At a follow-up visit later in the month, Dr. Patel diagnosed depression and prescribed Celexa. AR 498-99.

In February 2014, Plaintiff began medication management and psychotherapy at Inland Psychiatric Center. AR 587. Plaintiff reported anxious and fearful thoughts, compulsive thoughts, depressed mood, difficulty concentrating, problems falling asleep and staying asleep,

ncbi.nlm.nih.gov/books/NBK448113 (accessed March 4, 2020)).

excessive worry, poor judgment and restlessness. AR 587. Psychiatrist Syam Kunam, M.D., diagnosed major depressive disorder and prescribed Ativan and Lexapro. AR 588.

Also in February 2014, Dr. Rudek diagnosed post-hernia repair pain. AR 507. Plaintiff was still off work due to groin and leg pain. AR 507. Dr. Rudek suggested a local injection by an anesthesia pain specialist. AR 507. If the injection did not help, treatment could include groin exploration, neurolysis and removal of mesh. AR 507. Dr. Patel continued to treat Plaintiff for groin pain and depression. AR 515. Plaintiff also received counseling and physical therapy. AR 516.

In May 2014, Dr. Patel addressed Plaintiff's complaints of moderately severe right leg and knee pain. AR 554. X-ray imaging of Plaintiff's right knee revealed normal alignment and no significant joint disease or soft tissue anomaly. AR 567. Dr. Patel diagnosed arthritis and rotator cuff tendinitis as causes of Plaintiff's moderately severe left shoulder pain. AR 555-56. X-ray imaging revealed degenerative changes of the acromioclavicular joint but no soft tissue anomalies. AR 567. In June 2014, Dr. Patel noted that Plaintiff was receiving physical therapy for his groin pain with "minimal improvement." AR 544.

Also in June 2014, Plaintiff began psychiatric care at Kaiser's Canyon Crest Behavioral Center. AR 545. Psychiatrist Nickoles Odell Mahaffey, M.D., observed Plaintiff's anxious and depressed mood and restricted affect, but no homicidal or suicidal intent and no psychotic or inappropriate thought content. AR 549. Dr. Mahaffey diagnosed major depression and post-traumatic stress disorder. AR 550. The doctor opined that Plaintiff's GAF score was in the 51-60 range, characterized by moderate symptoms or moderate difficulty in social, occupational or school functioning.[3] AR 550.

Physical therapist Emily Rachel Lee, P.T., evaluated Plaintiff's left shoulder pain, which Plaintiff rated 6/10. AR 551. Ms. Lee's examination revealed that shoulder strength was slightly

---

[3] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty is social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*
.

reduced (4/5) but the range of motion was within normal limits. AR 552. She opined that Plaintiff's shoulder pain had decreased his activity level by 25 percent. AR 552. Ms. Lee identified a movement coordination problem and provided an in-home exercise program to strengthen Plaintiff's shoulder. AR 552.

When Plaintiff lost his job in June 2014, he also lost his insurance coverage and transferred his care to the Veteran's Administration (VA). AR 612. VA psychiatric nurse practitioner Aida F. Johnson conducted an intake interview in September 2014. AR 612-15. Plaintiff was then hearing voices daily and awakening to his own screams following dreams that he could not remember. AR 612-13. Plaintiff disclosed that at about the age of ten he been taken by an affluent neighbor ("abductor") who convinced Plaintiff's parents that he could provide Plaintiff with advantages not within the reach of Plaintiff's parents, who had limited means. AR 612. For approximately the next five years the abductor isolated and sexually abused Plaintiff. AR 612. Palm Desert police recovered Plaintiff after discovering a suspicious photograph that the abductor had discarded. AR 612. Later, while in the Navy, Plaintiff was troubled by homosexual overtures from other sailors. AR 612. As an adult, Plaintiff sublimated his trauma by becoming a workaholic. AR 612. Because of Plaintiff's high score on the PCL-C (PTSD Checklist—Civilian), Ms. Johnson recommended further exploration of possible PTSD. AR 613.

In October 2014, Plaintiff began PTSD treatment. AR 601. In the course of a suicide risk assessment, Plaintiff disclosed that he had twice attempted suicide in 1975 while in the Navy. AR 601-02, 609.

Also in October 2014, Plaintiff began treatment at a VA pain clinic. AR 598-99. Because Hydrocodone had been ineffective, Plaintiff's physician prescribed gabapentin and recommended that Plaintiff consider a nerve block. AR 598, 605. The physician noted that Plaintiff had been experiencing incontinence since his hernia repair. AR 605.

In July 2016, VA providers noted that as a result of his pain Plaintiff had not walked normally since his hernia repair at Kaiser. AR 1026. They ordered a walker for Plaintiff's use and physical therapy to teach him to use it safely. AR 1029. In July and August 2016, Plaintiff was treated for severe pain and swelling of his left hand. AR 1213-15, 1222-23. He was

5

diagnosed with a ganglionic cyst of the left thumb.  AR 1248.

Neurologist Hewitt F. Ryan, M.D., performed an EMG study to address numbness in Plaintiff's lower extremities following his hernia repair.  AR 1019-21.  Dr. Ryan summarized his findings:

> There is evidence of a mild peripheral neuropathy in the left lower extremity and left upper extremity.   There is no definite electrophysiologic evidence of an active left lumbosacral radiculopathy; there are minor EMG abnormalities noted in the left peroneus longus and left L5 paraspinal muscle suggestive of very mild chronic deinnervation [*sic*].   There is no electrophysiologic evidence of a superimposed left carpal tunnel syndrome.

AR 1020.

In August and September 2016, Plaintiff participated in physical therapy intended to address his groin, hip and shoulder pain, and bilateral leg numbness and pain.  AR 920.  Plaintiff needed a cane or walker to ambulate.  AR 920-25.

Beginning in or about August 2016, psychiatrist Rachel H. Rose, M.D., provided psychotropic medication oversight and referred Plaintiff to clinical psychologist Bradley Norlander for PTSD therapy.  AR 1197, 1231-43.  Following an initial appointment, Dr. Rose noted a preliminary diagnosis of PTSD and schizoaffective disorder (bipolar type).[4]  AR 1241.  In October 2016, Dr. Rose requested a pharmacy consultation concerning Plaintiff's dual use of opioids for pain and benzodiazepine for anxiety.  AR 1015-18.  Dr. Rose noted that Plaintiff's use of duloxetine was aggravating Plaintiff's bipolar symptoms.  AR 1016.  Clinical mental health pharmacist David Charlestham, Pharm.D., approved Dr. Rose's proposed trial of Lorazepam and also suggested several alternative treatments for Dr. Rose's consideration.  AR 1017.

///

When Dr. Norlander began psychotherapy with Plaintiff in October 2016, Plaintiff

---

[4]  "Schizoaffective disorder is a mental health condition that includes features of both schizophrenia and a mood disorder such as bipolar disorder or depression.  The prefix 'schizo-' refers to the psychotic symptoms of schizophrenia that affect a person's thinking, sense of self, and perceptions . . . . . The bipolar type includes both dramatic 'highs,' called manic episodes, and 'lows,' called depressive episodes.  The depressive type includes only depressive episodes.  Manic episodes are characterized by increased energy and activity, irritability, restlessness, an inability to sleep, and reckless behavior.  Depressive episodes are marked by low energy and activity, a feeling of hopelessness, and an inability to perform everyday tasks. "  www.ghr.nlm.nih.gov/condition/schizoaffective-disorder (accessed March 22, 2020).

received a high score on the PCL-5, a PTSD assessment tool. AR 1176. Plaintiff disclosed to Dr. Norlander his childhood sexual abuse. AR 1180. With Plaintiff's consent, Dr. Norlander referred Plaintiff to the Sexual Trauma Treatment Program (STTP). AR 1176.

STTP clinical psychologist Emily Lawrence, Ph.D., treated Plaintiff beginning in November 2016,[5]. AR 64, 77, 80, 84, 86, 88, 1162, 1176. Plaintiff told Dr. Lawrence that the perpetrator of the childhood assaults kept him captive and brainwashed, sometimes isolating Plaintiff in the desert or mountains. AR 84. He discussed with Dr. Lawrence his experiencing many years of alcoholism and confusion as well as relationship difficulties with his former wife and current girlfriend. AR 84.

On January 12, 2017, Plaintiff was admitted to the Fresno VA Medical Center after being treated in the emergency department for suicidal ideation in the context of recent social stressors (lack of income and housing instability[6]) and alcohol use. AR 1002. His presenting symptoms also included low energy and poor sleep interrupted by nightmares. AR 1004. The admitting diagnosis was schizoaffective disorder. AR 1128. Although Plaintiff's symptoms improved during his stay, Plaintiff continued to experience nightmares which hospital personnel treated by increasing Plaintiff's dosage of doxazosin. AR 1004. The medication enabled Plaintiff to sleep for increased periods. AR 1004.

Although Plaintiff admitted heavy alcohol use, he denied that he had a problem with alcohol.[7] AR 1004. Accordingly, psychiatrists Dwayne R. Depry, D.O., and psychiatry resident Amina Sutherland-Stolting noted Plaintiff's limited insight and judgment regarding his condition. AR 1006. Dr. Sutherland-Stolting noted that Plaintiff declined to participate in programs addressing his use of alcohol and tobacco. AR 1036, 1040. Plaintiff was stabilized and

---

[5] After issuance of the hearing decision, the Appeals Council received additional evidence of VA treatment from February 2, 2017 through February 26, 2018. AR 2. After reviewing the evidence, the Council concluded that it did not show a reasonable probability that it would have changed the outcome of the ALJ's decision. AR 2. The Court notes that some of the material provided to the Council was already part of the administrative record. (Materials submitted at or prior to the agency hearing appear at AR 346-1353.)

[6] Plaintiff was then living with his unemployed girlfriend.

[7] "Among individuals who have schizophrenia or schizoaffective disorder schizophrenia or schizoaffective disorder, alcohol use disorder (AUD) is common, and it contributes to worse outcomes than for those who do not have co-occurring substance use disorder." L. Archibald, M.F. Brunette, and A.I. Green, ""Alcohol Use Disorder and Schizophrenia or Schizoaffective Disorder," Alcohol Res. 2018 at 40(1), reproduced at www.ncbi.nlm.nih.gov/pmc/articles/PMC6927747/ (accessed March 22, 2020).

discharged on January 17, 2017.  AR 1002.

On February 15, 2017, Plaintiff was again admitted to the Fresno VA Medical Center after being treated in the emergency department for suicidal ideation.  AR 1275-1347.  Plaintiff was sleepy and dizzy.  AR 1347.  Plaintiff reported that he had done well for about a week after his last hospitalization before again being overwhelmed by stress.  AR 1329.  He had received communication from the VA stating that because of his income, he would be billed co-pays for the prior year's medical treatment.[8]  AR 1329.  Following a series of arguments with his girlfriend, Plaintiff realized that his anger was out of control so he left his girlfriend's home to avoid becoming violent.  AR 1329.  He was living in his truck and drinking about one-half pint of liquor daily.  AR 1329.  Plaintiff went to the emergency department when he began thinking about killing himself by overdosing on fentanyl patches.  AR 1329.  He told medical personnel that he was hopeless and had nothing to live for.  AR 1329.

Nurse Ryan del Mando, R.N., noted that Plaintiff was withdrawn and isolated himself in his room.  AR 1298.  He exhibited mild symptoms of alcohol withdrawal, including sweating, tremors, elevated temperature and anxiety.  AR 1298.  He was unable to verbalize any alternative ways to cope with his recent stress.  AR 1298.  Plaintiff also had a painful rib or abdominal injury, apparently incurred when jumping into a dumpster.[9]  AR 1329.  He was diagnosed with homicidal ideation after stating that would fight with his neighbor again and "hit him."  AR 1347.  Plaintiff declined care for his alcohol addiction.  AR 1288.  Plaintiff left the hospital against medical advice on February 16, 2017.  AR 1277.

Plaintiff continued therapy with Dr. Lawrence.  At the May 2017 appointment, Plaintiff revealed suicidal ideation without intent or plan, leading to a discussion about possible hospitalization.  AR 77, 82, 92.  Dr. Lawrence observed that Plaintiff was having difficulty with personal hygiene, was showering only every third or fourth day, and was sleeping in his clothes.  AR 77, 80, 82, 86.  Plaintiff told Dr. Lawrence that he had difficulty experiencing joy and was

---

[8] Hospital staff investigated Plaintiff's claim and discovered that that he had no balance owed and that he had exempt status for prescriptions and medical care.  AR 1286.

[9] Although Plaintiff appears to have had only a single injury, hospital records sometimes refer to a rib injury and sometimes an abdominal injury.

"waiting to die." AR 77. Plaintiff's gross motor function was impaired, and he indicated pain. AR 65, 77, 80, 82, 86, 84. He had difficulty paying attention. AR 92.

In a June 2017 summary, the VA primary care team noted Plaintiff's active problems included chronic pain, alcohol dependence syndrome, chronic post-traumatic stress disorder, leg pain, moderate mood disorder and benign essential hypertension. AR 68. Medications included an albuterol inhaler (COPD), amlodipine besylate (heart/blood pressure), atenolol (heart), baclofen (muscle spasms), budesonide/formoter inhaler, cholecalciferol (vitamin D3 supplement), cyanocobalamin (vitamin B12 supplementation), diclonefac NA gel (pain), doxazosin mesylate (nightmares), gabapentin (pain), hydrocodone/ acetaminophen (pain), lisinopril (heart/blood pressure), meloxicam (pain and inflammation), montelukast NA,[10] quetiapine fumarate (mood), urea 20% cream (calluses), amlodipine besylate (high blood pressure) and doxycycline hyclate (antibiotic). AR 68-69. X-ray studies identified degenerative changes of the cervical spine at C6-7 and moderate degenerative changes of the lower lumbar spine. AR 61.

In February 2018, the Department of Veterans Affairs granted Plaintiff 50 per cent service-related disability for post-traumatic stress disorder (PTSD) and alcohol use disorder. AR 46. The finding of post-traumatic stress disorder was premised on Plaintiff's documented symptoms, including: (1) occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood; (2) suspiciousness; (3) depressed mood; (4) suicidal ideation; (5) disturbances of motivation and mood; (6) mild memory loss; (7) impaired impulse control; (8) chronic sleep impairment; (9) near-continuous panic affecting the ability to function independently, appropriately and effectively; (10) difficulty in adapting to stressful circumstances; (11) difficulty in adapting to work; (12) flattened affect; (13) intermittent inability to perform maintenance of minimal personal hygiene; (14) difficulty in

///

///

adapting to a work-like setting; (15) anxiety; (16) difficulty in establishing effective work and

---

[10] Montelukast is prescribed to prevent wheezing, difficulty breathing, chest tightness and coughing caused by asthma. Medlineplus.gov/druginfo/meds/a600014.html (accessed March 3, 2020).

social relationships; and, (17) intermittent inability to perform activities of daily living.  AR 47-48.

### B.  Medical Opinions

#### 1.  Agency Physicians

In July 2014, R. Paxton, M.D., concluded that Plaintiff's affective disorders were not severe.  AR 143.  On reconsideration in December 2014,  J. Foster-Valdez agreed with Dr. Paxton.  AR 151-52.

#### 2.  Consultative Opinion

In June 2014, Sohini F. Parikh, M.D., a board eligible psychiatrist, prepared a complete psychiatric evaluation.  AR 533-39.  Plaintiff's mood was depressed and anxious.  AR 536. Following an interview and mini mental status exam, Dr. Parikh diagnosed:

| | | |
|---|---|---|
| Axis I: | 1. | Post traumatic stress disorder. |
| | 2. | Depressive disorder NOS. |
| | 3. | History of alcohol in the past. |
| Axis II: | Deferred. | |
| Axis III: | 1. | Left inguinal hernia surgery done. |
| | 2. | Arthritis. |
| | 3. | High blood pressure. |
| Axis IV: | Stressors are mild. | |
| Axis V: | Global assessment of functioning: 64-69. | |

AR 537-38.

In Dr. Parikh's opinion, Plaintiff had mild impairment in his ability to reason and make social, occupational and personal adjustments, specifically:

1.  There were no restrictions in the claimant's daily activities.

2.  There were mild mental difficulties in maintaining social functioning.

3.  The claimant's concentration, persistence and pace were not impaired.

4.  There were repeated episodes of mild emotional deterioration in work-like situations.

10

5.  The claimant's ability to understand, carry out, and remember simple instructions was not impaired.

6.  The claimant's ability to understand, carry out, and remember complex instructions was mildly impaired.

7.  The claimant's response to coworkers, supervisors, and the general public was mildly impaired.

8.  The claimant's ability to respond appropriately to usual work situations was mildly impaired.

9.  The claimant's ability to deal with changes in a routine work setting was mildly impaired.

AR 538.

### 3.  Medical Source Statements: Dr. Rose

Plaintiff's psychiatrist Dr. Rose completed a mental impairment questionnaire on April 25, 2017.  AR 1348-53.  Dr, Rose diagnosed Plaintiff:

Axis I:          PTSD, substance induced mood disorder

Axis II:         none

Axis III:        chronic pain

Axis IV:         social, occupational

Axis V:          Current GAF: 60; Highest GAF Past Year: 60

AR 1348.

Plaintiff evidenced severe impairment of attention, concentration and focus; easy distractibility; slow thinking; mood swings; anxiety; irritability; depression; and, lethargy, poor sleep and fatigue.  AR 1348.  His treatment included medication and intensive therapy weekly with a psychologist.  AR 1348.  Plaintiff showed good effort and achieved some mild reduction of symptoms, but not sufficiently to affect employability.  AR 1348.  His signs and symptoms included anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; poverty of content of speech;

11

generalized persistent anxiety; somatization unexplained by organic disturbance; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; psychomotor agitation or retardation; pathological dependence, passivity or aggressivity; persistent disturbances of mood or affect; change in personality; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions which are a source of marked distress; substance dependence; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); intense and unstable interpersonal relationships and impulsive and damaging behavior; hallucinations or delusions; motor tension; emotional lability; deeply in grained, maladaptive patterns of behavior; vigilance and scanning; easy distractibility; memory impairment—short, intermediate or long term; sleep disturbance; and, recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on average at least once a week.  AR 1349.

Dr. Rose opined that Plaintiff had no useful ability to function in order to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR 1359.  With regard to unskilled work, Plaintiff was unable to meet competitive standards in order to remember work-like procedures; understand, remember and carry out very short and simple instructions; maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and, be aware of normal hazards and take appropriate precautions.  AR 1350.  With regard to skilled or semi-skilled work, Plaintiff

was unable to meet competitive standards to understand, remember and carry out detailed instructions; set realistic goals or make plans independently of others; and, deal with stress of skilled or semiskilled work. AR 1351. Plaintiff was unable to meet competitive standards to interact appropriately with the general public; adhere to basic standards of neatness and cleanliness; and, travel to an unfamiliar place. AR 1351. He was seriously limited but not precluded from maintaining socially appropriate behavior and using public transportation. AR 1351.

Plaintiff's psychiatric condition was exacerbated by chronic pain of the groin, arms and hands, and knees. AR 1352. He had two episodes of decompensation leading to hospitalization for periods less than two weeks. AR 1352, In Dr. Rose's opinion, Plaintiff had medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least two years' duration that has caused more than minimal limitation to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and either three of more episodes of decompensation within twelve months, each at least two weeks long, or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate. AR 1352. Plaintiff had moderate functional limitation of activities of daily living; and extreme difficulties in maintaining social functioning; maintaining concentration, performance and pace; and, four or more episodes of decompensation within a twelve week period, each of at least two weeks duration. AR 1352.

Plaintiff could be expected to be absent from work more than four days per month. AR 1353. In addition to his mental health impairments, Plaintiff would experience difficulty working

///

at a regular job on a sustained basis due to chronic pain, difficulty walking (uses cane), arthritis and pain medications. AR 1353.

### IV.    <u>Standard of Review</u>

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the

Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

**V.    The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive

finding that the claimant is or is not disabled. 20 C.F.R. §§ 404.1527, 404.1529.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 404.1520(a)-(f).

### VI.      Summary of the ALJ's Decision

The Administrative Law Judge found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 31, 2014. AR 30. His only severe impairment was "status post hernia repair." AR 30. This severe impairment did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). AR 34. Plaintiff had the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c). AR 34.

Plaintiff was able to perform his past relevant work as a sheet metal worker. AR 37. Accordingly, the ALJ found that Plaintiff was not disabled at any time from January 31, 2014, the alleged onset date, through July 18, 2017, the date of the decision. AR 37.

### VII.     The ALJ Failed to Apply the *de Minimus* Standard at Step Two

At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii). An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments. 20 C.F.R. § 416.902(f). If a claimant does not have an impairment of combination of impairments which significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment. 20 C.F.R. § 416.920(c).

In Plaintiff's case, the ALJ found a single severe impairment: "status post hernia repair." AR 30. In the course of a lengthy step-two analysis, the ALJ found that the following

impairments were not severe: neuropathy, left shoulder pain, chronic obstructive pulmonary disease, alcohol dependence, depression and anxiety.  AR 30-31. The ALJ did not acknowledge diagnoses of chronic severe post hernia repair pain, incontinence, PTSD and schizoaffective disorder (bipolar type).

Plaintiff contends that the ALJ erred in failing to find that Plaintiff had a severe mental impairment based on Dr. Rose's opinion.  The Commissioner responds that the ALJ properly evaluated the medical evidence and determined Plaintiff's mental health impairments were not severe.

Having reviewed the hearing decision and the record as a whole, the Court concludes that the ALJ's analysis at step two imposed an inappropriately high standard for determining a severe impairment or combination of impairments.  In addition, the ALJ made multiple findings that were not consistent with the evidence in the record.  As a result, this case must be remanded for reconsideration of Plaintiff's impairments at step two, particularly in light of the deterioration of Plaintiff's physical and mental health in the period between hernia repair surgery that resulted in pain, and the date of the hearing decision.

### A.      The Severity Regulation Imposes a *de Minimus* Standard at Step Two

"The step-two inquiry is a *de minimus* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual['s] ability to work."  *Id.* at 1290; SSR 85-28.  "[T]he severity regulation is to do no 'more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.'"  SSR 85-28 (quoting *Baeder v. Heckler*, No. 84-5663 (3d Cir. July 24, 1985)).  For example, the Ninth Circuit has found an ALJ to have erred in failing to categorize as a severe impairment at step two minor arthritic changes of a claimant's ankle that resulted in pain and a limp.  *Gardner v. Astrue*, 257 Fed.Appx. 28, 29 (9th Cir. 2007).  Chronic post-hernia repair pain, incontinence, peripheral neuropathy, shoulder pain, chronic obstructive pulmonary disease, post-traumatic stress disorder, alcohol dependence, schizoaffective disorder (bipolar), major

depression and anxiety are not generally considered to be impairments of so minimal a nature that they could never prevent a person from working.

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his or her ability to function as well as considering the claimant's subjective symptoms, such as pain or fatigue. *Smolen*, 80 F.3d at 1290. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28. The ruling warned:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, it the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, Ms. Smolen suffered from childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain. *Smolen*, 80 F.3d at 1290. The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit. *Id.* The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity. *Id.* The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Id.* at 1291. In this case, the ALJ's finding that Plaintiff's impairments, other than his hernia repair, to be not severe at step two similarly resulted in their omission from subsequent steps of the disability analysis.

**B.     An ALJ May Not Isolate or Ignore Evidence to**

In addition, an ALJ may not find an impairment to be not severe by discussing only those portions of the treatment record that favor a conclusion of non-severity. "Although it is within the power of the Secretary to make findings concerning the credibility of a witness and to weigh conflicting evidence, *Rhodes v. Schweiker*, 660 F.2d 722, 724 (9th Cir. 1981), he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result. *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982)." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). It is legal error to ignore medical evidence of a claimant's other impairments without giving specific, legitimate reasons for doing so. *Smolen*, 80 F.3d at 1282. Further, although the ALJ attempted to provide reasons for categorizing Plaintiff's other impairments as nonsevere, he relied both on selective citation of portions of the administrative record and on factual conclusions that were not supported by the record as a whole.

Note first the ALJ's unusual characterization of Plaintiff's sole severe impairment as "status post hernia repair." The Commissioner typically uses the language "status post _____" at step two to denote completed treatment for a past impairment. However, Plaintiff's impairment exceeded simple surgical resolution of a previously existing hernia. Following repeated attempts by various medical specialists to alleviate Plaintiff's intractable pain following hernia surgery, Dr. Rudek diagnosed "post-hernia repair pain," a more accurate designation of Plaintiff's impairment. AR 507.

Plaintiff's hernia repair also resulted in incontinence and peripheral neuropathy in Plaintiff's left lower extremity. AR 605. As noted in the factual background above, VA providers observed that as a result of his pain, Plaintiff had not walked normally since his hernia repair at Kaiser. To address Plaintiff's ambulatory problems and associated pain, the VA providers ordered a walker and physical therapy to assist Plaintiff in safely using it to support ambulation with good posture. AR 1019-21, 1026, 1029. As with the impairments associated with Ms. Smolen's cancer treatment, Plaintiff's associated impairments were relevant to Plaintiff's functional abilities and should have been included as severe impairments at step two and

18

subsequently been evaluated individually and in combination in the course of the residual functional capacity analysis at step four.

The ALJ's selective attention to the medical opinions and records was exacerbated by fact finding that was not supported by the record as a whole. When evaluating an ALJ's factual analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins*, 466 F.3d at 882. In this case, the ALJ began his analysis of the severity of Plaintiff's mental health impairments by summarizing the evidence:

> The claimant's medically determinable mental impairments of alcohol dependence, depression[,] and anxiety, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere. Specifically, the claimant has not sought outpatient counseling, all mental status examinations noted negative psychiatric symptoms or mental functioning findings were within normal limitations.

AR 31.

The evidence of record does not support a finding that Plaintiff's mental status was within normal limits, or that Plaintiff never received outpatient counseling. As detailed in the factual background above, Plaintiff had begun psychotropic medication management and psychotherapy by February 2014. AR 516, 587. His symptoms then included anxiety, fearful and compulsive thoughts, depression, difficulty concentrating, insomnia, excessive worry, poor judgment and restlessness. AR 587. Although Dr. Kunam opined that various elements of Plaintiff's functioning were mildly or moderately impaired, the doctor diagnosed major depressive disorder. AR 588. Subsequent medical records indicated continuing mental health problems.

In June 2014, Plaintiff began psychiatric care at Kaiser's Canyon Crest Behavioral Center. AR 545. Dr. Mahaffey diagnosed major depression (recurrent, moderate) and post-traumatic stress disorder and opined that Plaintiff's GAF score was in the 51-60 range. AR 550. After Plaintiff transferred his care to the VA, a mental health intake interview noted that Plaintiff was hearing voices daily and screaming himself awake following nightmares that he could not remember. AR 612-15. Thereafter, Plaintiff received treatment for PTSD. AR 601. In the

course of an associated suicide risk assessment, Plaintiff disclosed that he had twice attempted suicide.  AR 601-02, 609.

Plaintiff continued treatment at VA facilities following his move to California's Central Valley.  Dr. Rose provided psychotropic medication oversight, and Dr. Norlander provided PTSD therapy.  AR 1197, 1231-43.  Dr. Rose diagnosed PTSD and schizoaffective disorder (bipolar type).  AR 1241.  Dr. Rose subsequently requested a pharmacy consultation to assist her in prescribing medications that would alleviate both Plaintiff's bipolar disorder and anxiety, but not interact with his pain medications. AR 1015-18.  After learning of Plaintiff's childhood sexual abuse, Dr. Norlander referred Plaintiff  to the Sexual Trauma Treatment Program (STTP) where Plaintiff began treatment with Dr. Lawrence, a clinical psychologist.  AR 64, 77, 80, 84, 86, 88, 1162, 1176.

On January 12, 2017, Plaintiff was admitted to the Fresno VA Medical Center and received five days of inpatient treatment for suicidal ideation in the context of recent social stressors (lack of income and housing[11]) and alcohol use.  AR 1002.  The admitting diagnosis was schizoaffective disorder.  AR 1128.  Although Plaintiff conceded his heavy alcohol use, he denied that he had a problem with alcohol leading his psychiatrists to note his limited insight and judgment concerning his mental health impairment.  AR 1004, 1006.

On February 15, 2017, Plaintiff was again admitted to the Fresno VA Medical Center after being treated in the emergency department for homicidal and suicidal ideation. AR 1275-1347.  The hearing decision did not acknowledge Plaintiff's second hospitalization, although the ALJ

///

had the relevant evidence by the May 2017 hearing.  AR 97.  Step Two fact finding continued to follow this pattern of factual selectivity and mischaracterization.

Finally, the hearing decision relies on documentation from 2014, although Plaintiff's extensive continued psychiatric and psychological treatment up to the July 2017 hearing decision was well documented in the administrative record.  By omitting consideration of the record as a whole, the ALJ omitted the majority of Plaintiff's diagnosis and treatment from the analysis.

---

[11] Plaintiff was then living with his unemployed girlfriend and feared imminent homelessness.

## C. **ALJ's Rejection of Severe Impairments Due to Plaintiff's Alcoholism**

The ALJ acknowledged Plaintiff's first psychiatric hospitalization but minimized its importance in light of Plaintiff's continued alcoholism:

> The undersigned is cognizant that the claimant had one voluntary psychiatric admission due to suicidal ideation. However, the claimant had continued his alcohol use and smoking despite contrary indications. Specifically, on January 12, 2017, claimant was admitted to the hospital during the same period as his [*sic*] excessive alcohol use and was diagnosed with substance induced mood disorder. At the admission, claimant reported drinking one half pint of whiskey, three times each week. Treatment records noted claimant's alcohol use had been persistent despite mood symptoms and impaired ability to function. Claimant was hospitalized for five days during which time he showed improvement. Specifically, claimant was released on January 17, 2017. Mental status exam noted neutral mood with congruent restricted affect, linear logical and goal directed though process, normal speech, good eye contact and limited insight and judgment.

AR 31 (citations to administrative record omitted)

As discussed above, Plaintiff conceded his heavy alcohol use but denied that he had a problem with alcohol, which his treating psychiatrists characterized as Plaintiff's having limited insight and judgment concerning his mental health impairment. AR 1004, 1006. To that extent, the ALJ's fact finding is correct. However, separating the effect of mental illness on a claimant's functioning from the effect of alcohol use on that same claimant's functioning is not a simple matter. *See* C.A. Kubitschek and J.C. Dubin, Social Security Disability Law and Procedure in Federal Court, §5:54 at 798 (Thomson Reuters 2020). A claimant's abuse of alcohol is not sufficient, of itself, to permit the ALJ to minimize or reject other evidence of mental illness. *See* S.S.R. 13-2p (requiring the ALJ to conduct a six-step evaluation to determine whether a

///

claimant's drug addiction or alcoholism is material to a finding that the claimant is disabled). The hearing decision in this case does not include the analysis prescribed by S.S.R. 13-2p.

## D. **The Omission and Mischaracterization of Plaintiff's Impairments at Step Two Was Not Harmless Error**

In concluding that Plaintiff's sole severe impairment was "status post hernia repair," the ALJ disregarded the severity rule, relied on isolated portions of the record and mischaracterized

Plaintiff's diagnoses and symptoms. The error cannot be considered harmless. As stated above, the severity regulation is intended to provide a *de minimus* standard to allow the Secretary to deny benefits summarily to claimants whose impairment(s) are so minimal that they would never justify a finding of disability but to allow full consideration of the existence and effect of impairments exceeding the *de minimus* standard. *See* SSR 85-28. Plaintiff's constellation of impairments may or may not have resulted in an ultimate finding of disability, but Plaintiff deserved a fair analysis performed in compliance with applicable law and with full consideration of the evidence as a whole.

Because of the ALJ's errors at step two, the Court remands this case for analysis of the evidence as a whole in accordance with applicable law. On remand, the Commissioner is directed to reassess Plaintiff's severe impairments at step two, then proceed to analyze all subsequent steps of the analysis while continuing to accurately evaluate the record as a whole and comply with all applicable law.

**VIII.   No Further Development of Record Was Required**

In the course of Plaintiff's contention that the determination of his severe impairments at step two was not supported by substantial evidence, Plaintiff contends that the ALJ should have further developed the record concerning his physical impairments. The Commissioner disagrees.

A claimant generally bears the burden of proving his or her entitlement to disability benefits. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R § 404.1512(c). But Social Security hearings are not adversarial proceedings. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Whether or not the claimant is represented by counsel, the ALJ "must inform himself about the facts relevant to his decision." *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1 (1983). "The ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). *Accord Tonapetyan*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Smolen*, 80 F.3d at 1288.

An ALJ's obligation to obtain additional evidence is triggered only when the evidence from the treating medical source is inadequate to determine the claimant's disability. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.

2001) (holding that ALJs have a duty fully and fairly to develop the record when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence). In this case, Plaintiff presented a detailed and lengthy record establishing the basis for his claims of physical and mental health impairments. The record was neither ambiguous nor inadequate to provide a basis from which the Commissioner could determine whether or not Plaintiff's impairments resulted in disability. Although factual and legal error occurred in the step two analysis of Plaintiff's claim below, the record would have been adequate had the ALJ properly evaluated it as a whole in accordance with the provisions of applicable law. No further development of the record was needed.

## IX.    Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled was supported by substantial evidence in the record as a whole nor determined in accordance with applicable legal standards. Accordingly, this Court REMANDS this case for further proceedings in accordance with this decision. The Clerk of Court is directed to enter judgment in favor of Plaintiff James Havsgaard and against Defendant Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 23, 2020**               **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE